LEHIGHTON AREA SCHOOL
DISTRICT, Appellant,

v.

CARBON COUNTY BOARD OF AS-
SESSMENT and Gnaden Huet-
ten Memorial Hospital.

Commonwealth Court of Pennsylvania.

Argued April 11, 1997.

Decided Jan. 26, 1998.

Thomas F. Traud, Jr., Allentown, for appellant.

Oldrich Foucek, III, Allentown, for appellee, Gnaden Huetten Memorial Hospital.

Before DOYLE and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

DOYLE, Judge.

Lehighton Area School District (District) appeals an order of the Court of Common Pleas of Carbon County which determined that Gnaden Huetten Memorial Hospital (the Hospital) was entitled to a charitable exemption from local real estate taxes.

### FACTUAL BACKGROUND

The Common Pleas Court made extensive findings of fact in this matter in *In re Petition & Appeal of the Lehighton Area School District* (No. 89–C–2635, filed September 26, 1996). Those findings may be summarized as follows.

### History, Charity Care, and Community Services

The Hospital is located in a small community, the Borough of Lehighton, and provides medical care to persons living in largely rural Carbon, Monroe, and Schuylkill Counties. It was established at the end of the Second World War, when, after a referendum, local residents decided to construct a hospital as a memorial to war veterans. The project was financed through a community fund drive, and those contributions, which included a grant of land, allowed the construction of the Hospital.

The Hospital is a non-profit corporation and is exempt from federal income taxes as a corporation organized exclusively for charitable purposes.[1] Sixteen trustees serve as the Hospital's governing body and, although they dedicate substantial time and services to the Hospital, the trustees receive no compensation for their services.

With regard to charitable care, the Hospital's original mission statement was "People Helping People," and that statement has been reaffirmed by the Hospital on an annual basis. The mission statement further provides as follows:

> [w]e shall strive to provide compassionate, high-quality health care, consistent with clinical capabilities, to all people in our region *regardless of ability to pay*. Our services, programs and activities are designed to help people attain optimum health status.

(Common Pleas Opinion at 4, Finding of Fact No. 21.) (Emphasis in the original.)

In accord with the above mission statement, the Hospital maintains an open admission policy, under which the Hospital has never declined to provide medical care to a person because he or she could not afford to pay for treatment. The Hospital has formal charity care procedures, which consider a patient's income and assets to determine whether the patient is entitled to entirely free care. The income guidelines are set at 150% of the poverty guidelines established under the federal Hill–Burton program,[2] increasing the class of low-income persons eligible for charity care. In order to protect the patient's welfare, medical care is provided to a needy patient *before* the Hospital determines whether that person is eligible for charity care. The Hospital is required under the Hill–Burton program to donate $69,000 each year in charity care, which represents ten percent of federal loans to the Hospital.

In addition, the Hospital provides care to indigent patients through the Medicaid[3] program, and such patients constitute approximately 18 percent of the total number of its patients. Because government reimbursement for medical services provided to Medicaid patients falls short of the actual costs of that treatment, the Hospital subsidizes care to Medicaid patients by absorbing the unreimbursed cost of treatment. Similarly, the Hospital subsidizes the care given to elderly patients insured through the federal Medicare[4] program by absorbing the difference between the actual cost of that care and the government's reimbursement level. The Hospital's service area contains a disproportionate number of elderly individuals and, as a result, Medicare patients represent approximately 45 percent of the Hospital's patients. With regard to both Medicaid and Medicare, the Hospital has no policy to limit or control

---

1. The Hospital is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). An organization is eligible for an exemption under Section 501(c)(3), if, among other things, it is organized and operated exclusively for a charitable purpose and no part of its earnings inures to benefit shareholders or other private persons.

2. The Hill–Burton Act, 42 U.S.C. §§ 291–291o–1, is a federal statute which offers funds for the construction and modernization of hospitals. Hill–Burton mandates that facilities that receive such funds provide a certain amount of free care

in return. 42 U.S.C. § 291c(e); *White v. Moses Taylor Hospital*, 763 F.Supp. 776 (M.D.Pa.1991).

3. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396u. Medicaid is a federal program intended to provide health care to any person, regardless of age, who needs financial assistance to purchase health care services.

4. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ccc. Medicare is a health program designed, primarily, to furnish medical care to persons over sixty-five years of age.

the amount of care offered to patients insured through those programs.

When the Hospital treats an uninsured or underinsured person who does not qualify for charity care and the patient does not have the ability to pay his or her medical bills, it does not seek to collect the unpaid charges. The cost of such care is written off by the Hospital as a bad debt. The Hospital uses collection agencies to collect unpaid debts only where the patient has the ability to pay but will not.

The total value of uncompensated care provided by the Hospital to elderly, indigent, and uninsured persons, calculated on a cost basis, has ranged from $941,203 to $2,376,542 annually for the years relevant to this litigation. The above amounts include Medicare and Medicaid shortfalls, traditional charity care, free services provided under the federal Hill–Burton program, and patient charges written off at cost as bad debts.

The Hospital has also made substantial donations to community-sponsored programs which offer benefits to the community. Those programs include the following: Meals on Wheels (annual donations between approximately $7,400 to $9,500); free community programs for women (annual cost between approximately $18,000 and $66,000); community outreach programs (annual cost ranging from approximately $32,400 to $47,000); and an advanced life support ambulance program in cooperation with Good Samaritan Hospital of Pottsville (annual costs ranging from approximately $103,000 to $403,000). These are only some of the programs. Considering all donations to community programs combined, the Hospital donated between $220,000 and $464,000 per year during the time periods relevant to this matter.

### Corporate Structure and Financial Condition

Presently, the Hospital owns one subsidiary corporation, CMS Hospital Care Corporation (CMS), a non-profit entity that the Hospital uses to recruit physicians to practice in the Hospital's service area. Because the communities surrounding the Hospital are underserved by physicians, the Hospital created CMS in 1989 to attract medical practitioners to the region. CMS currently employs one physician and has never generated revenues in excess of its expenses.

Furthermore, as part of its effort to attract physicians to Carbon County, the Hospital extended loans at market rates to certain physicians. The loans, varying from a high of $350,000 to a low of $75,000, were at interest rates set by the financial market and were repaid in full with the exception of one loan where $104,000 of debt was forgiven.

The Hospital operates a nursing home, which provides services to the elderly without regard to the person's ability to pay. The Hospital also owns a heliport utilized for transporting patients in need of emergency care. In addition, the Hospital owns a conference center, which is used for medical training and other Hospital functions, as well as storage and office space. Although the Hospital owns land containing a physician-owned medical office building, the physician/owners pay real estate taxes on the value of the building, which is assessed separately.

From 1987 to 1991, the Hospital was affiliated with Health East, Inc., a non-profit corporation which operates Lehigh Valley Hospital in Allentown, Pennsylvania. The affiliation resulted in the Hospital becoming part of a system of hospitals controlled by a parent corporation, H.E., Inc. In return for becoming part of Health East, the Hospital received management support services including legal advice, computer information, risk management, financial management, and executive recruitment services. Further, the Hospital was given access to fifteen medical specialists that would not have otherwise been available. At no time during the affiliation with Health East did the Hospital relinquish its individual corporate identity or cede control of its assets, endowment, or reserves to Health East. The Hospital was, however, required to pay Health East for the services it rendered. In 1989, the Hospital paid Health East $549,000; in 1990, it paid approximately $550,000. There was also a single payment of $200,000 to Health East for development of a computer system. The affiliation agreement with Health East was

significantly revised in 1991. Under this new arrangement, the Hospital now receives a limited amount of management services from Health East in return for a monthly payment of approximately $2,000.

With regard to the Hospital's financial condition, the Hospital's net income during the years relevant to this matter ranged from a low of $427,131 to a high of $1,018,409. The Hospital's managers are not paid excessive salaries[5] and the Hospital has no incentive compensation plans or bonuses related to the financial performance of the Hospital.

### PROCEDURAL HISTORY

The Hospital owns twenty-four parcels of land in Carbon County. It pays taxes on all but five of those properties, which have always been exempt from local taxes. The five exempt properties contain the following improvements: (parcel 1) the Hospital; (parcel 2) a nursing home; (parcel 3) a heliport; (parcel 4) a medical office building; and (parcel 5) a conference center which also houses the Hospital's offices, records, and equipment. In 1989, the District challenged the Hospital's tax exemptions by filing an appeal with the Carbon County Board of Assessment and Revision of Taxes. After conducting a hearing, the Board denied the District's appeal, and the District appealed the Board's decision to the Common Pleas Court.

Following a bench trial, Common Pleas determined that the Hospital was entitled to a charitable tax exemption based on and applying the principle laid down in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*). In *HUP*, the Supreme Court identified the following five factors to be considered when determining whether a particular organization qualifies as a purely public charity:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free of the profit motive.

*Id.* at 22, 487 A.2d at 1317. The Common Pleas Court concluded that the Hospital satisfied every element of the above test and, therefore, qualified as a purely public charity.

The Common Pleas Court also examined the additional requirements for a tax exemption under Section 204 of the General County Assessment Law (Law),[6] which confers a tax exemption on institutions "founded, endowed, and maintained by public or private charity." The court found as fact that the Hospital was founded and endowed, and is maintained by public and private charity, and that it has reinvested its revenues almost entirely to improve its own facilities. Hence, the Common Pleas Court determined that the Hospital was entitled to an exemption under Section 204 of the Law. A final order of the court was entered on October 18, 1996.

### ISSUES PRESENTED

The District contends that the Common Pleas Court erred in concluding that the Hospital was a purely public charity, because it failed two elements of the *HUP* test: first, that the Hospital is free of a profit motive; and (2) second, that the Hospital gratuitously donates a substantial portion of its services to those in need. Furthermore, the District contends that the court erred in holding that the Hospital satisfied Section 204 of the Law, because the Hospital made payments of cash to Health East, Inc., made loans to physicians, and advanced money for the creation of a life support ambulance service.

---

**5.** The Hospital's CEO, at the time of the hearings in this matter, had an annual salary of $105,000 per year, which is twenty percent below market average. His compensation included the benefits the Hospital normally provides its employees, plus an automobile and a country club membership. The Hospital's employees are generally paid from fifteen to twenty percent below market average.

**6.** Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–204.

## DISCUSSION

Article 8, Section 2 of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. Based on that grant of authority, the General Assembly enacted Section 204 of the Law, creating a local tax exemption for purely public charities.

██ We first review the *HUP* standard, keeping in mind that the applicant must satisfy all five criteria of the *HUP* test. *Associated YM–YWHA of Greater New York/Camp Poyntelle v. County of Wayne,* 149 Pa. Cmwlth. 349, 613 A.2d 125 (1992). An organization does not qualify as a purely public charity merely because it is a non-profit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth,* 673 A.2d 1021 (Pa.Cmwlth.1996). By satisfying the *HUP* test, the applicant demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. *City of Washington v. Board of Assessment Appeals of Washington County,* 666 A.2d 352 (Pa. Cmwlth.1995), aff'd, —— Pa. ——, 704 A.2d 120 (1997).

Furthermore, Section 204(a) of the Law, 72 P.S. § 5020–204(a), provides the following relevant standard for tax exempt real property:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

. . . .

(3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity ... founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose. . . .

### Is the Hospital a purely public charity?

The District contends that the Hospital does not qualify as a purely public charity because it fails two elements of the *HUP* test, namely, it does not gratuitously donate a substantial portion of its services to persons in need and it is not free from a profit motive. The District does not challenge the conclusion of the Common Pleas Court that the Hospital satisfied the remaining elements of the *HUP* test and, accordingly, we need not consider those three elements.[7]

██ At the threshold, however, we must observe that, although the District developed an argument in its brief on the question of whether the Hospital donates a substantial amount of its services to those in need, the District presented no argument on the question of whether the Hospital is free of the profit motive. To quote from the District's brief: "a hospital that does not donate ... gratuitously a substantial portion of its services also does not operate entirely free of the profit motive." The District apparently believes that those elements of the *HUP* test are so inter-related that a separate analysis of each element is not required. (Appellant's brief at 9.) In our view, however, those two elements of the *HUP* test at issue here are distinct and must be decided on different factual and legal grounds. We have frequently decided cases where an entity has satisfied one element and not another. *Fellowship International Mission, Inc. v. Lehigh County Board of Assessment Appeals,* 690 A.2d 1271 (Pa.Cmwlth.1997) (mission was free of the profit motive, but did not donate a substantial portion of its services), *petition for allowance of appeal denied,* 549 Pa. 706, 700 A.2d 444 (1997); *Pinnacle Health Hospitals, Successor by Consolidation to Polyclinic Medical Center v. Dauphin County Board of Assessment Appeals,* 708 A.2d 845 (Pa.

---

7. The Hospital suggests that the *HUP* test is not applicable to non-profit hospitals, because such institutions are presumed to offer essential services to society. What the Hospital is asking this Court to do, in essence, is to define separate classes of non-profit institutions, some of which would have to satisfy the *HUP* test to qualify as a public charity and others which would not. This we decline to do. *See The Couriers–Susquehanna, Inc. v. County of Dauphin,* 693 A.2d 626 (Pa.Cmwlth.1997) (*Couriers II*).

Cmwlth.1998) (hospital donated gratuitously a substantial amount of its services, but was not free of the profit motive). Therefore, because the District did not actually present a separate argument on the separate issue of the Hospital's profit motive,[8] that issue is deemed waived. Accordingly, we will only consider whether the Hospital has donated gratuitously a substantial amount of its services. *Mason & Dixon Lines v. Mognet,* 166 Pa.Cmwlth. 1, 645 A.2d 1370 (1994); *Park v. Chronister,* 151 Pa.Cmwlth. 562, 617 A.2d 863 (1992), *petition for allowance of appeal denied,* 534 Pa. 654, 627 A.2d 731 (1993).

 In order to satisfy its burden of establishing that the Hospital donates or renders gratuitously a substantial portion of its services, the Hospital must demonstrate that it makes a bona fide effort to service those persons who are unable to afford the usual fee or medical care. In other words, the charitable organization must show that it provides services to someone who cannot afford to pay, *In re Appeal of Capital Extended Care,* 148 Pa.Cmwlth. 128, 609 A.2d 896 (1992), and the determination as to whether the services donated by the organization are "substantial" is to be made based on the totality of the circumstances; there is no bright line test, based on a certain percentage of donated services, for resolving this question. *HUP; City of Washington.* Furthermore, the organization need not forgo available government payments which cover part of its costs; nor is it required to provide wholly gratuitous services. *Mt. Macrina Manor v. Fayette County Board of Assessment Appeals,* 683 A.2d 935 (Pa.Cmwlth. 1996).

 In the present case, Common Pleas found that the Hospital has donated medical services to the elderly, indigent, uninsured, and underinsured. Considering all categories of charitable care, the aggregate value of those donations, based on the cost of the services to the Hospital and not the fee charged, ranged from approximately $941,-000 to $2,376,000 per year. (Finding of Fact No. 41.) Specifically, for the years 1989 through 1995, the Hospital annually performed uncompensated services, looking at the lowest and highest yearly expenditures during the relevant period of time, in the following categories and amounts: $71,000 to $152,000 in traditional charity care; $365,000 to $485,000 in Medicaid shortfalls; $286,000 to $1,521,000 in Medicare shortfalls; $6,000 to $29,000 in free non-Hill-Burton care offered at the time of admission; $18,000 to $47,000 in free non-Hill-Burton care offered after admission; and $201,000 to $839,950 written off in patient bad debts. (Hospital's Trial Exhibit 28 at 27–29; Reproduced Record at 670a–672a.) **Medicare and Medicaid patients make up approximately 63 percent of the Hospital's total patient population.** (Findings of Fact Nos. 32 and 34.) Over all, the Hospital maintains an open admission policy and no person has ever been denied treatment because of an inability to pay. (Findings of Fact Nos. 22–24.)

In addition, the Hospital donated, during the fiscal years from 1992 through 1995, approximately $220,000 to $464,000 per year to community service programs. Some of these programs, in particular "Meals on Wheels," the advanced life support ambulance system, and health programs for women and men, provide free health-related services to the community.

It is clear from the above that the Hospital makes a bona fide effort to gratuitously provide services to individuals who would other-

**8.** As part of its argument that the Hospital's donations to community service programs should not be considered when determining whether the Hospital gratuitously donates a substantial portion of its services, the District mentions that donations to community programs may increase the occupancy rate of the Hospital and, thus, its "profits." Also, as part of that argument, the District states that the Hospital has generally posted a financial surplus of approximately two-to-three percent each year and that that "same budgeting analysis also demonstrates a keen pri-

vate profit motive." (District's Brief at 22.) While neither of those assertions were further developed by the District in its brief, we note that they are without merit. Giving money away to community organizations and operating community service programs are not activities indicative of an organization that has a profit motive, but are more characteristic of a charity. *HUP.* Further, merely because an organization has surplus revenue does not, without more, demonstrate a profit motive. *Couriers II.* The terms "surplus," "net revenue," and "profit" are not synonymous.

wise be unable to afford the fees for the care provided, and we believe that the record more than adequately shows that the Hospital has consistently provided a significant amount of free medical services to needy patients throughout the years relevant to this litigation. Therefore, we conclude that the Hospital donates a substantial portion of its services.[9] *See Mt. Macrina Manor* (where an institution maintains an open admissions policy and treats a large percentage of Medicare and Medicaid patients, and absorbs the unreimbursed cost of those patients' care, the institution donates a substantial portion of its services).

The District, however, challenges many of the categories of uncompensated care provided by the Hospital as insufficient to satisfy this element of the *HUP* test.

■ First, the District challenges the amount of traditional charity care provided by the Hospital and argues that in return for federal loans, the Hospital **is required** to provide $69,000 of free medical care each year under the Hill–Burton program. In the District's view, because the Hospital is mandated by the federal government to offer that level of free care, the amount of traditional charity care credited to the Hospital must be reduced by $69,000 for each year. We disagree. Although the Hospital is obliged under Hill–Burton to offer some level of free care to indigent patients, the transaction between the Hospital and the patient is completely gratuitous. More important, however, the Hospital gave free care to patients in excess of the amount mandated by Hill–Burton which demonstrates that its motivation for offering free medical care was not limited to fulfilling its obligations under that program. Therefore, this argument must fail.

■ Next, the District challenges the classification of Medicare and Medicaid shortfalls as gratuitous donations. The District claims that, because the Hospital has a contractual obligation to accept the amount

reimbursed by Medicare and Medicaid as payment in full for the services rendered, the Hospital is not rendering gratuitous care. Also, the District asserts that the Medicaid shortfall is being created by the Hospital's own inefficiency and that the Medicare shortfalls are the result of the Hospital's decision to charge more than the government will pay. Contrary to this argument, our Supreme Court in *St. Margaret Seneca Place v. Board of Property Assessment, Appeals & Review of Allegheny County,* 536 Pa. 478, 640 A.2d 380 (1994), stated that an institution is not required to forgo government payments which cover only part of its costs in order to demonstrate that it donates services. Essentially, the difference between what the government pays under Medicaid or Medicare and the cost of treatment constitutes a subsidy of a patient's medical care, regardless of the Hospital's contractual arrangement with the government. Furthermore, as to the District's argument that the shortfalls are caused by inefficiency or overcharges, the Medicaid and Medicare shortfalls here, as recognized by the Common Pleas Court, were based on the **actual cost** of the services to the Hospital, and not on the amount that would normally be charged for the services. The parties stipulated before the Common Pleas Court that the cost of services is equal to 70 percent of the amount that would be charged. Therefore, this argument is without merit.

■ Further, the District argues that both the free non-Hill–Burton services offered after admission and written off at cost and the unpaid medical bills written off as bad debts are not charity because the Hospital had no donative intent when it rendered those services. This argument, however, is contradicted by the Common Pleas Court's findings of fact:

37. Due to its open admissions policy, each year the Hospital *expects* that a certain amount of its care billed to patients not eligible for participation in the Hill–

---

9. The District argues that, comparing the Hospital's 1995 revenue with its total charity care for that same year, the Hospital donated only six percent of its revenue to charity; hence, the Hospital does not donate a "substantial" portion of its services. However, our Supreme Court

declined to establish a "magical percentage" in *HUP,* preferring to analyze this issue on a case by case basis. We believe that the six percent donated by the Hospital is substantial in light of the factors discussed in this opinion.

Burton Program ... will not be reimbursed; and, yet, *it willingly treats those uninsured or underinsured patients.*

38. Following a patient's discharge from the Hospital, a bill ... is sent to the patient. If it is subsequently determined that a patient may not have the ability to pay for those services, the amount of any such bill is accounted for as a bad debt and written off.

(Common Pleas Opinion at 6, Findings of Fact Nos. 37–38.) (Emphasis added.) In view of the above findings, the Hospital's policy of writing off "bad debts" is, in reality, a mechanism for providing services to patients too affluent to qualify for Medicaid or Hill–Burton funds but too poor to pay for their medical care. The Hospital willingly treats such uninsured and underinsured patients under the terms of its open admissions policy, and, on many occasions, the Hospital is simply unable to make such determinations before the services are rendered and the patient is discharged. (Finding of Fact No. 29.) Writing off unpaid bills is a flexible and reasonable tool for dealing with uninsured and underinsured patients. Therefore, we hold that the Hospital's "bad debts" in this case were properly considered by the Common Pleas Court as donations.

■ The District next argues that the donations by the Hospital to community service programs are simply "marketing devices" intended to make the Hospital more competitive and cannot be deemed to be gratuitous donations. We disagree. These programs offer tangible benefits to the community and, in our view, to classify these donations as mere "marketing tools" demeans the donative intent underlying the gift. But, even if the Hospital's decision was partially motivated by a desire to attract patients, we do not understand how that would detract from the impact such services have on the community. *See HUP* (analysis must focus on whether an institution, in fact, donates free services, and not on its intentions).

Therefore, we hold that the Common Pleas Court correctly determined that the Hospital gratuitously donates a substantial portion of its services to those in need, and, because the Hospital has satisfied every element of the *HUP* test, the Court correctly found that the Hospital qualified as a purely public charity.

### Is the Hospital entitled to a tax exemption under Section 204 of the Law?

The District contends that the Hospital fails to satisfy the requirements of Section 204 of the Law because, instead of reinvesting its monies back into the institution, the Hospital transferred money to other entities and persons, namely, Health East, Inc. and made loans to certain physicians and ALLS, Inc., the operator of the emergency life support ambulance service.[10]

■ Section 204(a)(3) of the Law, 72 P.S. § 5020–204(a)(3), provides in pertinent part that, to qualify for a tax exemption, the institution, must satisfy the following condition:

[T]he entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose....

Hence, Section 204 expressly allows revenue to be used for (1) support of the institution, (2) increasing the efficiency and facilities of an organization, and (3) necessary increase in buildings and grounds. *West Allegheny Hospital v. Board of Property Assessment, Appeals & Review of Allegheny County,* 500 Pa. 236, 455 A.2d 1170 (1982).

■ In the present case, it is clear from the record that the Hospital advanced loans to various physicians and that the Hospital gave substantial amounts of money to ALLS, Inc. to establish the emergency life support ambulance service. The aforementioned transactions, however, are reasonable measures to support and increase the efficiency of the Hospital, considering the fact that the Hospital is located in a rural area chronically underserved by medical care.

---

**10.** We note that the District does not argue that these transfers are evidence that the Hospital is not entirely free of the profit motive.

The record reveals that the Hospital used the loans to physicians to attract medical professionals to Carbon County and the surrounding region and to improve the quality of its obstetric/gynecology department. Because physicians are the foundation of any healthcare system, using loans to attract physicians to an underserved region is a legitimate mechanism for supporting and increasing the efficiency of the Hospital and the health care of the community.

With regard to the life support ambulance service, the record indicates that, prior to the creation of ALLS, Inc., Carbon and Schuylkill Counties were the only counties in Pennsylvania that did not have such an emergency life support system. Obviously, the Hospital invested its money in such an ambulance system in order to ensure that critically injured and ill persons can be kept alive and rapidly transported to the Hospital. That investment clearly supports and improves the operation of the Hospital, and advances its overall mission of delivering health services.

 The District further argues that monies transferred from the Hospital to Health East during the affiliation from 1987 to 1991 precludes the Hospital from qualifying for an exemption under Section 204 of the Law. The record reveals that the Hospital did transfer approximately $550,000 to Health East each year in 1989 and 1990 and that the Hospital paid that corporation $200,000 for development of a computer system. The District, however, ignores the fact that the Hospital received substantial services and grants in return for those transfers. The Hospital received a package of management services, which the Common Pleas Court found could not be produced by the Hospital "in-house." Also, the Hospital received $575,000 in grants from Health East and a membership in the Voluntary Hospitals of America. The membership saved the Hospital between $70,000 and $100,000 each year in purchasing

discounts. In addition, the Hospital gained access to fifteen medical specialists. All the above benefits, in our view, supported and increased the efficiency of the Hospital. Because the Hospital received substantial benefits in return for the funds transferred to Health East, which benefits supported and enhanced the functioning of the Hospital, we hold that the Hospital qualified for a tax exemption under Section 204 of the Law.[11]

### CONCLUSION

In sum, for the reasons stated above, we hold that the Common Pleas Court correctly determined that the Hospital is an institution of purely public charity entitled to an exemption from local real estate taxes, and, accordingly, the order of that court is affirmed.

### ORDER

NOW, January 26, 1998, the order of the Court of Common Pleas of Carbon County in the above-captioned matter is hereby affirmed.

11. Governor Tom Ridge recently signed into law the Institutions of Purely Public Charity Act (Act), Act of November 26, 1997, P.L. ____, No. 55, which has enacted extensive legislative changes under the provisions of Article 8, Section 2(a)(v) of the Constitution, which provides:
 (a) The General Assembly may by law exempt from taxation:

....
 (v) Institutions of purely public charity....
 Although Section 16 of the Act provides that its major provisions will take place immediately, they have no effect on the tax years at issue in this case.