**PINNACLE HEALTH HOSPITALS, Successor by Consolidation to Polyclinic Medical Center, Appellant,**

v.

**DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS, County of Dauphin, School District of the City of Harrisburg, City of Harrisburg.**

**PINNACLE HEALTH HOSPITALS, Successor by Consolidation to Polyclinic Medical Center**

v.

**DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS, County of Dauphin, School District of the City of Harrisburg, City of Harrisburg.**

**Appeal of COUNTY OF DAUPHIN, Appellant.**

Commonwealth Court of Pennsylvania.

Argued April 11, 1997.

Decided Jan. 26, 1998.

Stephen A. Moore and James L. Fritz, Harrisburg, for appellant.

Kenneth D. Chestek, Erie, for appellees, County of Dauphin, School District of the City of Harrisburg and the City of Harrisburg.

Before DOYLE and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

DOYLE, Judge.

Before this Court are the consolidated cross appeals of Pinnacle Health Hospitals, successor by consolidation to Polyclinic Medical Center (Polyclinic),[1] and the County of Dauphin, School District of Harrisburg, and the City of Harrisburg (collectively, the County) from two orders of the Court of Common Pleas of Dauphin County (Common Pleas). The first order, issued on March 23, 1995, granted Polyclinic's petition to remove its properties from the tax assessment rolls for calendar year 1993 and fiscal year 1993–1994, but denied Polyclinic's request to have its tax exempt status reinstated for subsequent years. The second order, which was entered on September 10, 1996, denied Polyclinic's petition to have its tax exempt status restored permanently. Polyclinic appeals

---

1. Polyclinic merged with Harrisburg Hospital, forming the Pinnacle Health Hospitals, on December 31, 1995. The instant appeal, however, involves real estate taxes for certain years prior to the merger and the opinion will, therefore, focus solely on the activities of Polyclinic and its related corporate siblings.

from both the March 23, 1995 order **and** the September 10, 1996 order. The County appeals from the March 23rd order only.

## FACTUAL BACKGROUND

Common Pleas made extensive findings of fact in its opinion in *Polyclinic Medical Center of Harrisburg v. Dauphin County Board of Assessment Appeals,* No. 5085 S 1993 (C.P. Dauphin September 10, 1996), which may be generally summarized as follows:

### History and Charitable Works

Polyclinic, located in Harrisburg, Pennsylvania, was founded in 1909 through a combination of private and public contributions. Since the date of its founding, Polyclinic has evolved into a large community teaching hospital, which offers a comprehensive array of medical, surgical, and diagnostic services. The hospital provides a wide range of services to the community through its emergency room, inpatient facilities, clinics, and out-patient treatment. In 1994 alone, Polyclinic admitted more that 17,000 patients, treated over 157,000 persons on an out-patient basis, and handled in excess of 33,000 emergency room visits. Approximately nineteen percent of the total number of hospital beds in the Harrisburg area are at Polyclinic, and the medical center provides twenty percent of all inpatient care in the same area. Polyclinic also offers educational programs in medical residency, nursing, medical technology, and radiology.

Polyclinic was incorporated as a non-profit corporation in 1909, and from 1937 it has been a tax exempt charity for federal income tax purposes.[2] It is organized on a non-stock basis and, accordingly, there are no shareholders or owners entitled to receive distributions of any of its revenues. Polyclinic's corporate directors serve without compensation. Further, the hospital's corporate by-laws contain the following mission statement:

It is the primary function of [Polyclinic] to provide for the care of the sick and injured. This responsibility includes the education of physicians, nurses and ancillary Medical Center Personnel; participation in programs to prevent disease and promote the health of the community; and encouragement of medical research. Since the patient and the community must ultimately bear the cost of hospital care, it is recognized that the broad social responsibility accepted by [Polyclinic] must be accomplished within the economic limitations of the community and the financial resources of [Polyclinic].

No person has ever been denied medically necessary treatment or admission to the hospital because they could not afford to pay. Polyclinic has an open admissions policy, under which it provides care without regard to race, creed, nationality, or the ability to pay. When a person is admitted to Polyclinic, it determines whether the person can pay for treatment, and, if not, Polyclinic will attempt to place the person on medical assistance or attempt to qualify the person under Polyclinic's charity care policy. Pursuant to that charity care policy, under which patient eligibility is determined using federal poverty guidelines, a qualified patient will receive free care. Polyclinic provides sixty percent of the care for indigent persons in the City of Harrisburg and approximately fifty-two percent of indigent care in Dauphin County.

Polyclinic also forgives charges incurred by patients who cannot pay their bills. As a result, charges incurred by indigent patients are written off as bad debts. The following amounts were written off from 1992 through 1994: $1,874,000 in 1992; $1,986,215 in 1993; and $1,955,520 in 1994. Polyclinic also terminates collection proceedings when it determines that the delinquent patient qualifies for free care; collections are only pursued against patients who can pay but refuse to do so.

More than half of Polyclinic's in-patient care is provided to persons eligible for Medicare and Medicaid. Government payments for Medicare patients fell short of the cost for such services in 1992 and 1993. Specifi-

---

**2.** Polyclinic is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). An organization is eligible for an exemption under Section 501(c)(3) if, *inter alia,* it is organized and operated exclusively for a charitable purpose and no part of its earnings inures to the benefit of shareholders or other private persons.

cally, in 1992 and 1993, Polyclinic experienced Medicare shortfalls of $602,000 and $902,626 respectively; no shortfall was experienced in 1994.

### Corporate Structure and Financial Condition

Polyclinic is one of a group of related corporate entities, which are described as follows:

- **The Polyclinic Health System (PHS).** PHS was formed in 1991 and is the parent corporation of several controlled corporate entities and serves as a holding company for those entities.
- **Polyclinic.** The medical center is a non-profit corporation that provides hospital and medical services. Polyclinic is a subsidiary of PHS.
- **Polyclinic Medical Center Foundation (Foundation).** The Foundation is a subsidiary entity of PHS. It is a non-profit foundation that engages in fundraising activities and accepts cash donations and pledges.
- **Polyclinic Professional Services (PPS).** A non-profit membership corporation in charge of operating several community-based physician practices. In recent years PHS has been acquiring the practices of various family physicians, or has initiated new practices, and continues to operate the practices as part of PPS. PPS is a subsidiary of PHS.
- **Polycare, Inc. (Polycare).** Polycare is a for-profit subsidiary of PHS. Polycare holds real estate and serves as a subsidiary holding company for the following for-profit healthcare service entities:

  - **Polyoptometric, Inc. (Polyopt).** A corporation which provides optometric services to employees of Polyclinic and the general public.

  - **Prime Care, Inc.** An organization to contract directly with employers to provide a full range of employee health services.

  - **Pennsylvania Home Infusion Therapy Associates (PHITA).** A joint venture with Harrisburg Hospital engaged in the provision of home intervenous therapy services.

  - **PNSS.** A joint venture with Harrisburg Hospital engaged in the provision of private duty nursing services.

The above organizational structure is graphically represented in the following organizational chart:

Polycare was established by funds from PHS, and, since its inception, Polycare has received more than $6,000,000 from PHS. PHS has also transferred funds to PPS to operate the family practices. In fiscal year 1995, PHS transferred $2,000,000 to PPS to fund operating losses and to finance practice acquisitions.

With regard to the family practices, PPS operates five such medical practices: Steelton Family Practice; Cumberland Family Practice; Tower City Family Practice; Uptown Internal Medicine Associates; and Derry Family Practice. These group practices have consistently lost money and the shortfalls have been covered by transfers of funds from PHS or Polyclinic. The practices were acquired by PHS so it can market itself as a full-service health system to third-party payers. The practices have also resulted in a substantial number of referrals to Polyclinic; in fiscal year 1994–1995 charges for medical care to patients referred from all of the practices to Polyclinic totaled $6,700,000 in the first eleven months of that fiscal year.

When PHS buys a family practice, the selling physician becomes an employee of PHS and serves the same patients as he or she did before the sale; the practice is in the same or a nearby location. Selling physicians sign employment contracts with PHS, which include covenants not to compete with PHS should they resign or be terminated from employment with PHS. In at least one case, a physician has an incentive compensation agreement, which is based, in part, on a percentage share of the gross revenue generated by the family practice.

From the fiscal year ending June 30, 1990 to the fiscal year ending June 30, 1994, Polyclinic has had an excess of revenue over expenses. In each of those years Polyclinic earned the following surplus revenues: $3,926,431, in 1990; $5,433,697, in 1991; $2,794,314, in 1992; $496,818, in 1993; and $3,226,068 in 1994.

Polyclinic's chief executive officer (CEO) received an annual salary of $230,000 in 1993. The CEO is provided with a benefit package which includes an automobile, a supplemental retirement benefit, and dues for the West Shore Country Club.

### PROCEDURAL HISTORY

In 1992, the County determined that the tax exempt status of various institutions in

the County should be re-examined. In particular, the County wished to reconsider whether hospitals (including Polyclinic), nursing homes, and other health care providers were entitled to exemptions from the real estate tax. Although Polyclinic had been exempt from local real estate taxes for more than 80 years, on January 11, 1993, it received a letter from the County, written by the Director of the County's Office of Tax Assessment, William Collins, notifying Polyclinic that its property would be placed on the tax rolls, effective January 1, 1993. The letter was accompanied by assessment notices changing the tax status of Polyclinic's parcels of land exempt from tax to taxable.

Polyclinic challenged the revocation of its exempt status in an appeal before the County's Board of Assessment Appeals, which, after conducting hearings on the matter in the summer of 1993, denied the appeal on October 28, 1993.

Thereafter, Polyclinic appealed the Board's decision to Common Pleas, asserting that it is an institution of purely public charity entitled to an exemption from the real estate tax.

After the parties engaged in discovery, Polyclinic, in collaboration with Harrisburg Hospital and Community General Osteopathic Hospital, filed a "Petition to Remove Property from the Assessment Rolls and to Strike Tax Assessment" with Common Pleas. The petition asserted that Director William Collins revoked Polyclinic's tax exempt status on his own authority, following instructions from a single County Commissioner, Anthony Petrucci. In Polyclinic's view, the power to remove tax exemptions is in the exclusive province of the County's Board of Assessment Appeals; the revocation, therefore, was invalid.

On March 23, 1995, Common Pleas granted Polyclinic's petition in part. Common Pleas concluded that Director Collins improperly revoked Polyclinic's tax exemption, because the Board was not involved in the elimination of Polyclinic's tax exempt status. Under Sections 3 and 7 of what is commonly known as the Third Class County Assessment Law (Assessment Law),[3] in the view of Common

Pleas, only the local board of assessment appeals is granted the initial authority to eliminate charitable tax exemptions. Common Pleas determined that Mr. Collins did not have the independent power to vacate the tax exemption sua sponte and, in light of the fact that County Commissioners have no authority to grant or revoke tax assessments, Commissioner Petrucci could not delegate any authority to Mr. Collins to revoke the hospital's tax exemption. Despite the procedural irregularities of Collins' revocation, Common Pleas limited the impact of that error to the year 1993 only, reasoning as follows:

> The [County] maintains that any procedural irregularities that resulted from the January 11 notice, or the conduct of the Director acting sua sponte on the exemption, only affect placing the hospital parcels on the tax rolls for 1993. This Court agrees. The letter of January 11, 1993 when combined with the extensive hearings held before the Board on each of the appeals as well as the ratification and endorsement of the Director's actions by the Board in denying the appeals ... can be construed as adequate notice to place [Polyclinic's] parcels on the 1994 tax rolls.

*Harrisburg Hospital v. Board of Assessment Appeals of Dauphin County,* 115 Dauph. 106, 115 (C.P.Pa.1995).

With regard to the merits, Common Pleas rejected Polyclinic's claim that it was a purely public charity and held that the hospital was not, therefore, entitled to a tax exemption. To resolve Polyclinic's appeal, Common Pleas applied the test articulated in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (hereinafter identified as *HUP*). In *HUP,* the Supreme Court identified the following five factors to be considered when determining whether a particular organization qualifies as a purely public charity:

(a) Advances a charitable purpose; .

(b) Donates or renders gratuitously a substantial portion of its services;

---

**3.** Act of June 26, 1931, P.L. 1379, *as amended,* 72    P.S. § 5344 and § 5348.

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free of the profit motive.

*Id.* at 22, 487 A.2d at 1317. Although Common Pleas found that Polyclinic satisfied the first four prongs of the *HUP* test, it determined that the hospital does not operate free of the private profit motive. Common Pleas' reasoning focused on the money transferred from Polyclinic to PHS, an amount in excess of six million dollars, which was then transferred to a menagerie of for-profit and non-profit corporations. The court noted that some of the entities funded by Polyclinic are in competition with other private individuals and businesses. Common Pleas further observed that the family medical practices are subsidized by the hospital and are not operated any differently than for-profit medical practices and show a profit motive. These appeals followed.

### ISSUES PRESENTED

As in the appeal of *Pinnacle Health Hospitals, Successor by Merger to Harrisburg Hospital v. Dauphin County Board of Assessment Appeals*, 708 A.2d 1284 (Pa. Cmwlth.1998) (*Harrisburg Hospital*), this case presents similar issues. Polyclinic contends that Common Pleas erred in holding that it did not operate free of the profit motive and, thus, was not a purely public charity under *HUP*. Further, as to the March 23, 1995 order, Polyclinic contends that Common Pleas erred in granting its petition to reinstate its tax exemption for 1993 only because the hospital's tax exempt status was never at any time properly revoked under the Assessment Law. With regard to the same order, the County, in its cross appeal, contends that Common Pleas erred in reinstating Polyclinic's charitable exemption for 1993.

4. Act of May 22, 1933, P.L. 853, *as amended*, 72

### DISCUSSION

We begin our review by again observing that Article 8, Section 2 of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. Based on that grant of authority, the General Assembly enacted Section 204 of the General County Assessment Law (Law),[4] which confers a tax exemption on property owned by organizations of purely public charity under certain circumstances. It is these two polestars which determine our judicial direction.

█ To receive a charitable tax exemption, the organization must first, of course, qualify as an institution of purely public charity. To do so, the applicant must satisfy all five criteria of the *HUP* test. *Associated YM–YWHA of Greater New York/Camp Poyntelle v. County of Wayne*, 149 Pa. Cmwlth. 349, 613 A.2d 125 (1992). An organization does not qualify as a purely public charity merely because it is a non-profit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth*, 673 A.2d 1021 (Pa.Cmwlth.1996). By satisfying the *HUP* test, the applicant demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. *City of Washington v. Board of Assessment Appeals of Washington County*, 666 A.2d 352 (Pa. Cmwlth.1995), aff'd, —— Pa. ——, 704 A.2d 120 (1997).

█ However, qualifying as a purely public charity under the *HUP* test does not, by itself, establish that the applicant is eligible for a charitable tax exemption. *Id.* In order to receive a charitable exemption, the organization must likewise satisfy the requirements of Section 204(a) of the Law, 72 P.S. § 5020–204(a), which provides the following relevant standard for tax exempt real property:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

. . . .

P.S. § 5020–204.

(3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity ... founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and necessary increase of grounds and buildings thereof, and for no other purpose....

72 P.S. § 5020–204.

## The procedural issue: The March 23, 1995 order

We will first consider the County's and Polyclinic's appeals from Common Pleas' March 23, 1995 order, which removed Polyclinic's property from the tax rolls for 1993 only.

Both Polyclinic's and the County's challenges to the March 23rd order focus on the procedures underlying Mr. Collins' January 11, 1993 order. Polyclinic asserts that the Board of Assessment Appeals has the exclusive authority to revoke tax exemptions. Therefore, because neither Mr. Collins nor Commissioner Petrucci had the authority to revoke its charitable exemption in the first instance, the revocation was invalid and, accordingly, the Board's later action upholding the revocation cannot be deemed to have ratified Mr. Collins' decision. Hence, Polyclinic's tax exemption must be reinstated. Further, even if the Board's decision is deemed to have ratified Mr. Collins' actions, the Board did not provide Polyclinic with notice within five days of the revocation of its charitable exemption, as required by Section 7 and 8 of the Assessment Law, 72 P.S. § 5348 and § 5349.[5]

The County asserts, on the other hand, that Mr. Collins had the authority under the Assessment Law to send the January 11th revocation notice since, as Director of the County's office of tax assessment, he was a subordinate assessor under the statute. In addition, the County notes that the ultimate decision to place the Hospital's property on the tax rolls was made by the Board, and not Mr. Collins.

The March 23, 1995 order challenged in this appeal is the same order we reviewed in *Harrisburg Hospital*. Further, the issues raised by Polyclinic and the County with regard to the March 23rd order are precisely the same as the issues raised in *Harrisburg Hospital*. Therefore, for the same reasons we stated in *Harrisburg Hospital*, this Court will affirm the Common Pleas Court's March 23rd order.

## The substantive issue: Is Polyclinic entitled to a charitable exemption?

Polyclinic contends that the Common Pleas Court erred in holding that it was not a purely public charity under the *HUP* test on the ground that it failed to sustain its burden of proving that the Hospital operated entirely free of a profit motive.

Initially, we note that Common Pleas held that the hospital satisfied the first four prongs of the *HUP* test, and while the County argues in its brief that Polyclinic fails all five elements of the *HUP* test, we will limit our analysis to the issue of whether Polyclinic operates entirely free of the profit motive, finding that dispositive of the appeal.

To determine if an organization is free of the profit motive, one of the indicia to establish, or deny, that element is whether the organization made a profit or whether excessive salaries and fringe benefits are paid to corporate officers. *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review, County of Alle-*

---

5. Section 7 of the Assessment Law states that the Board is authorized to make additions and revision to the assessment roll, so long as the notice provisions of Section 8 are complied with. Section 8 provides in relevant part:

(b) The board shall cause to be mailed to each owner of property or person assessed ... the value of whose property or personal assess-

ment has been changed from that finally fixed in the preceding assessment roll ... a notice of such change.... Such notice shall be mailed within five days from the date the board made such change or added said property to the roll and shall state that any person aggrieved by any assessment ... may appeal to the board for trial....

*gheny,* 536 Pa. 478, 640 A.2d 380 (1994). Other factors would include providing services to for-profit businesses, making loans at market interest rates, and owning for-profit subsidiary corporations. *Sacred Heart.* When an organization has a surplus of revenue and reinvests that money into the maintenance and operation of its own facility, however, surplus revenue does not constitute private profit. *Id.; West Allegheny Hospital v. Board of Property Assessment, Appeals, and Review,* 500 Pa. 236, 455 A.2d 1170 (1982). But, the diversion of surplus monies by an organization into **other entities** that do have a profit motive, **is** evidence of a profit motive. *Harrisburg Hospital.*

Polyclinic contends that the conclusion of the Common Pleas Court was erroneous, asserting that Polyclinic's investments into medical practices and other related entities were part of its development of an "integrated healthcare delivery system,"[6] an evolutionary change in organizational structure, necessary for Polyclinic to continue to service the community. Common Pleas, however, concluded that Polyclinic did not operate entirely free of a profit motive, not based on its complex organizational structure, but because Polyclinic transferred money through PHC into a for-profit corporation, Polycare, and to the family medical practices, which, although run by a non-profit corporations, have all the characteristics of profit producing entities. We agree with Common Pleas' analysis. The competitive edge of an "integrated healthcare delivery system" should not be the driving force which propels a charity to serve those in our community who are the least fortunate of us.

In the present case, Polyclinic, like *Harrisburg Hospital,* has transferred money to various business ventures. Such transfers are clear evidence that Polyclinic is not operated free of a profit motive. The Common Pleas Court found as fact that Polyclinic

transferred in excess of $6,000,000 to PHS, which invested funds in Polycare, a for-profit entity. Polycare operates several businesses including an optometry center, a private duty nursing business, and a home intervenous therapy business. PHS has invested millions of dollars in Polycare, which was used to fund those operations. Polycare has lost approximately $400,000 since its inception and those losses were covered by PHS and, ultimately, by Polyclinic. There is no evidence in the record that the businesses, while they are related to healthcare, have a charitable policy as their mission or donate any services gratuitously to legitimate subjects of charity at all. Therefore, the financial connection between Polyclinic and Polycare indicate that Polyclinic itself is not entirely free of the profit motive.

Polyclinic's relationship with the family practice centers is further evidence that it is not entirely free of the profit motive. The family practice centers are operated by PPS and the physicians are employees of Polyclinic. These practices, as observed by the Common Pleas Court, are operated in the same manner as private medical practices, which are normally profit-making businesses, and the evidence does not indicate that the family practice centers provide any charitable care whatsoever. The Common Pleas Court concluded that these practices are in direct competition with other profit-making businesses engaged in the practice of medicine. *Unionville–Chadds Ford School District v. Chester County Board of Assessment Appeals,* 692 A.2d 1136 (Pa.Cmwlth.) (competition between a non-profit institution and others engaged in similar businesses may indicate a proscribed profit motive), *appeal granted,* 549 Pa. 731, 702 A.2d 1063 (1997).

All of the family practice centers from July 1994 through May of 1995 sustained, collectively, a loss of $627,098. The Common Pleas Court concluded that cash from Poly-

---

6. In *Harrisburg Hospital,* we explained the term "integrated delivery system" as follows:

The term "integrated delivery system" is used by the Hospital to refer to a healthcare system that provides a wide range of medical services, from primary physician care, to traditional hospital care, to nursing home care. The creation of integrated delivery systems in the

healthcare industry is being driven by the rise of managed care. A managed care health plan can sign one contract with a single integrated delivery system and gain access to a full continuum of services, thereby avoiding the need of contracting with numerous medical providers.
*Id.,* 708 A.2d at 1283 n. 3.

clinic and PHS was used to subsidize those losses. In fact, the record shows that PHS transferred $2,000,000 in fiscal year 1995 to fund those operating losses and to fund the acquisition of additional practices. Polyclinic and PHS are willing to cover the losses of the family practices because they insure a continued flow of patients to the hospital. Patients referred to Polyclinic from the family practice centers resulted in charges of $6,700,000 in 1994 and 1995, an amount vastly greater than the $600,000 deficit subsidized by the hospital. That formulation of a "bottom-line" approach, however, while acceptable in, and for, an integrated health care delivery system, is nevertheless foreign as a tenet of care for the indigent.

The physicians who work in these practices, who are employed by Polyclinic, have covenants not to compete in their employment contracts. In the event an employed physician resigns or is terminated, the covenant precludes that physician from practicing medicine within a certain geographical area for a limited period of time. Such covenants have an obvious business purpose, but are at odds with the mission of a charitable hospital, which, in our view, must focus on providing medical services to those unable to afford care. In *Harrisburg Hospital*, we noted that the non-competition covenants could have the effect of preventing otherwise qualified physicians from providing medical care to those in need. While such a covenant in an employment contract, standing alone, is not conclusive as to whether an institution has a profit motive, *Harrisburg Hospital*, the covenants in the instant case, combined with the other indicia of the profit motive, provide support to the Common Pleas Court's decision.

In *Harrisburg Hospital*, under facts virtually identical to those in the instant case, we rejected the same argument raised by Polyclinic in this appeal, and held that Harrisburg Hospital was not free of a profit motive. Harrisburg Hospital, through a corporate structure which is similar to Polyclinic's,

transferred funds to a for-profit business and to family medical practices that had a profit motive. We reasoned as follows:

> When a hospital reinvests its surplus revenue back into the maintenance and operation of its facility, the surplus revenue is not 'profit.' *West Allegheny Hospital.* However, instead of reinvesting its monies back into its facilities, the Hospital decided to transfer vast amounts of money into various business ventures (one overtly for-profit and others ostensibly nonprofit but operated with a profit motive), using [a related corporate entity] as a conduit for those funds. Those transfers, in our view, constitute clear evidence of a private profit motive on the part of the Hospital. *See School District of the City of Erie v. Hamot Medical Center of the City of Erie*, 144 Pa.Cmwlth. 668, 602 A.2d 407 (1992) (Hamot Medical Center did not operate free of the profit motive when, among other things, it transferred $25,000,000, over approximately eight years, to related corporations, which then invested a substantial portion of that money in for-profit real estate investments); cf. *Sacred Heart* (loaning money to for-profit corporations and ownership of such entities is evidence that the applicant is not free of the profit motive).

*Harrisburg Hospital*, 708 A.2d at 1295. Therefore, under the above reasoning, we hold that Polyclinic is not entirely free of a profit motive.

### CONCLUSION

Because Polyclinic is not free of a profit motive, it does not qualify as a purely public charity under *HUP*, and, therefore, we affirm the judgment of the Common Pleas Court, and, because Polyclinic failed the *HUP* test, there is no need to consider Section 204 of the Law. *The Couriers–Susquehanna, Inc. v. County of Dauphin*, 693 A.2d 626 (Pa.Cmwlth.1997). Accordingly, the March 23, 1995 and September 10, 1996 orders of Common Pleas are affirmed.[7]

---

7. Governor Tom Ridge recently signed into law the Institutions of Purely Public Charity Act (Act), Act of November 26, 1997, P.L. _____, No. 55, which has enacted extensive legislative changes under the provisions of Article 8, Section 2(a)(v) of the Constitution, which provides:
   (a) The General Assembly may by law exempt from taxation:

## ORDER

NOW, January 26, 1998, the orders of the Court of Common Pleas of Dauphin County in the above-captioned matters are hereby affirmed.

. . . .

(v) Institutions of purely public charity. . . . Although Section 16 of the Act provides that its major provisions will take place immediately, they have no effect on the tax years at issue in this case.