PINNACLE HEALTH HOSPITALS, Successor by Merger to Harrisburg Hospital, Appellant,

v.

DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS, County of Dauphin, the School District of the City of Harrisburg, City of Harrisburg.

PINNACLE HEALTH HOSPITALS, Successor by Merger to Harrisburg Hospital

v.

DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS; County of Dauphin; City of Harrisburg; and School District of the City of Harrisburg.

Appeal of COUNTY OF DAUPHIN, Appellant.

Commonwealth Court of Pennsylvania.

Argued April 11, 1997.
Decided Jan. 26, 1998.
Reargument Denied March 12, 1998.

---

**1286**

Stephen A. Moore, Harrisburg, for appellant.

Kenneth D. Chestek, Erie, for appellee, County of Dauphin.

Before DOYLE and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

DOYLE, Judge.

Before this Court are the consolidated cross-appeals of the Pinnacle Health Hospitals, successor by merger to Harrisburg Hospital (Hospital),[1] and the County of Dauphin, School District of Harrisburg, and the City of Harrisburg (collectively, the County) from two orders of the Court of Common Pleas of Dauphin County. The first order, issued on March 23, 1995, granted the Hospital's peti-

tion to remove its properties from the tax assessment rolls for calendar year 1993 and fiscal year 1993–1994, but denied the Hospital's request for further reinstatement of its tax exemption for 1994 and subsequent years. The second order, entered on June 24, 1996, likewise denied the Hospital's petition to have its tax-exempt status restored. The Hospital appeals from both the March 23, 1995 order **and** the June 24, 1996 order. The County appeals from the March 23, 1995 order only.

### FACTUAL BACKGROUND

The Common Pleas Court made extensive findings of fact in its decision in *Harrisburg Hospital v. Dauphin County Board of Assessment Appeal,* 116 Dauph. 193 (C.P.Pa. 1996), which may be generally summarized as follows.

### History and Community Services

The Hospital is a Pennsylvania non-profit corporation and is a tax exempt charity for federal tax purposes.[2] It was founded in 1873 through a combination of public contributions and private charity, and has evolved from a single building and medical treatment center into a multi-structure acute-care teaching hospital with more than 471 beds. Historically, the Hospital has always enjoyed a charitable exemption from local real estate taxes.

The evolution of the Hospital into a modern medical facility was financed largely through public and private contributions. In recent years, the Hospital has received substantial donations from the community in the form of contributions, gifts, grants and volun-

---

1. The Hospital and its affiliated corporate entities merged with another local hospital, Polyclinic Medical Center, on December 31, 1995. Those organizations are now collectively known as the Pinnacle Health System. The instant appeal, however, involves real estate taxes for certain years prior to the creation of the Pinnacle Health System, and this opinion will, therefore, focus on the activities of the Hospital and its corporate siblings as they existed prior to the merger.

2. The Hospital is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). An organization is eligible for an exemption under Section 501(c)(3) if, *inter alia,* it is organized and operated exclusively for a charitable purpose and no part of its earnings inures to the benefit of shareholders or other private persons.

teer services in the following amounts: $1,744,076 in 1992; $1,659,850 in 1993; and $2,224,887 in 1994.

The Hospital's corporate by-laws state that the Hospital is to provide healthcare services to individuals without regard to their ability to pay. Accordingly, the Hospital has always maintained an open admissions policy, under which it treats persons regardless of their race, color, or economic resources. No person has ever been denied care or admission to the Hospital because he or she could not afford to pay. The Hospital makes every effort to identify persons who qualify for charity care at the earliest possible time in the treatment process, and the cost of medical services provided to such persons is charged to direct charity care or written off as a bad debt. The Hospital will pursue collection efforts only against patients who have the ability to pay for the provided medical services. However, if the Hospital later determines that such a patient is, in fact, eligible for charity care, the Hospital will make no further effort to collect the debt. Each year the Hospital forgives charges rendered to patients unable to pay their bills.

The Hospital also operates a clinic, which provides extensive primary care to an average of 20,000 indigent walk-in patients each year. Further, through its twenty-four hour emergency room, the Hospital treats, on average, an additional 35,000 persons each year. There is no government agency that operates a community hospital, primary care clinic for the indigent, or an emergency room, that services the same population as is treated by the Hospital.

### Corporate Organization and Financial Status

The various entities comprising the Hospital's corporate organization became collectively known as the Capital Health System (System) in 1983. The System is an integrated system for the delivery of health care services,[3] and includes the following corporate entities:

● **Capital Area Health Foundation (Foundation):** the parent corporation and owner of the System through the Foundation's ownership of Capital Health Systems Services (CHSS); this entity is specifically charged with furthering the purposes of the Hospital through fund raising and acceptance of community donations.

● **Capital Health Systems Services (CHSS):** a non-profit corporation which exercises supervision over the financial condition, financial operation and financial needs of the entire System, including the Hospital. Excess cash from all of the related entities is periodically transferred to CHSS.

● **Controlled Affiliates (Subsidiaries) of CHSS:**

 ● **Harrisburg Hospital (Hospital).**

 ● **Seidel Memorial Hospital.[4]**

 ● **Capital Extended Care,** a non-profit entity that operates an assisted-living facility known as Harrisfield.

 ● **Health Reach Home Care,** a non-profit home health care agency that also operates as a hospice.

 ● **Harrisburg Systems Services (HSS),** a tax exempt agency that employs physicians to operate family medicine centers.

 ● **Harrisburg Medical Management, Inc. (HMMI),** a for-profit corporation that engages in various business ventures.

The system's organizational structure is illustrated in the following organization chart:

---

3. The term "integrated delivery system" is used by the Hospital to refer to a healthcare system that provides a wide range of medical services, from primary physician care, to traditional hospital care, to nursing home care. The creation of integrated delivery systems in the healthcare industry is being driven by the rise of managed care. A managed care health plan can sign one contract with a single integrated delivery system and gain access to a full continuum of services, thereby avoiding the need of contracting with numerous medical providers. (Notes of Testimony (N.T.), 9/20/95, at 21–23; Reproduced Record (R.R.) at 212a–14a.)

4. Seidel Memorial Hospital is located in Mechanicsburg, Pennsylvania, approximately 11 miles west of the Hospital.

**Figure 1**

The Board of Directors of the Foundation is composed of members of the community, and they elect the Board of Directors of CHSS; the Board of directors of CHSS, in turn, elects the Board of Directors of the Hospital. The System's top executives are employed by CHSS. Although the Common Pleas Court did not make a specific finding on this point, the record indicates that the Board of Directors of CHSS and the executives employed by CHSS have de facto control over the System and make decisions on behalf of the entire System.

As mentioned above, CHSS receives the excess cash flow from all entities in the System. The Hospital's excess cash flow is the primary source of funds which CHSS transfers to the System's subsidiary corporations, including for-profit HMMI. From 1990 through 1994, the Hospital contributed or loaned nearly $23,700,000 to CHSS. That amount includes a capital contribution in excess of $14,000,000, and a transfer to CHSS

of $1,700,000 on an account receivable from HMMI.

In the mid–1980s, the System, through CHSS, created HMMI, a for-profit subsidiary corporation. HMMI engages in a variety of for-profit businesses including the operation of a magnetic resonance imaging facility, real estate acquisition and leasing, sales of medical supplies, and, until 1992, the practice of medicine through family medical practices. Further, HMMI operates a paint treatment center, is part owner of certain medical office buildings, runs a nurse staffing agency, and is engaged in joint ventures with other businesses and non-profit entities. The funding to establish and support HMMI was provided by CHSS, its owner, and CHSS's investment in that corporation was more than 8.4 million dollars from 1990 to 1993.

In recent years, affiliates of CHSS have been acquiring family medical practices.

The family medical practices were originally operated by HMMI, but, in 1992, their operations were transferred to HSS, a non-profit entity. When the System buys a medical practice, the selling physician generally becomes an employee of HSS and continues to serve the same patients in the same or a nearby location. The selling physician also signs an employment contract with HSS that includes a covenant not to compete with HSS in the event he or she is terminated or resigns from employment. HSS currently owns nine family practice centers, some of which were purchased from physicians or were started by HSS. Since their inception, the centers, collectively, have lost nearly four million dollars. That shortfall was covered by CHSS and, because CHSS uses income produced by the Hospital, ultimately, by the Hospital.

Further, the System, through CHSS, also has created a subsidiary to provide home nursing services, Health Reach Home Care, and a subsidiary to operate an assisted living facility for the elderly, Capital Extended Care. The home care subsidiary was financed through CHSS and, thereby, indirectly by the Hospital. The assisted living facility is also supported by funds from CHSS.

With regard to the financial condition of the Hospital, it generated substantial surplus revenues during the years from 1992 through 1994: $4,040,135 in 1992; $5,229,286 in 1993; and $4,374,239 in 1994. Further, from 1990 through 1994, the Hospital transferred $19,-000,000 in contributions to its funded depreciation account, an account used to pay for the replacement of buildings and capital equipment, as well as the repayment of long term capital debt.

The Hospital's chief executive officer (CEO) was paid a salary of $332,000 in 1994, which was a combination of base pay and a bonus paid under the Hospital's incentive compensation plan. The CEO also receives a benefit package which includes a life insurance plan, a plan which sets aside an additional five to seven percent of salary into benefits known as Execu–Flex, a disability salary plan, a retirement plan, a severance package, and a Section 83 Trust Plan, which functions as a deferred compensation plan, to which the Hospital contributes approximately $63,000 each year. The Hospital's incentive compensation plan, known as the Management Incentive Compensation Plan (bonus plan), is available to approximately 39 of the Hospital's senior managers, and allows such personnel to earn incentive bonuses of 30 percent of the eligible manager's base salary, if certain performance milestones are reached. The bonus plan provides a 40 percent bonus, calculated on base salary, for the CEO. When it was first created, objective measures of performance based on financial goals, such as return on equity, budget fund raising, revenue and income, were reviewed when determining whether to award a bonus. Charity care was added as a measure of performance in 1994. Executives are required to enter into restrictive covenants in return for the severance benefit package, which offers an executive up to eighteen months salary in the event employment is terminated for any reason other than for cause.

## PROCEDURAL HISTORY

The Hospital had been exempt from local real estate taxes since its incorporation in the 1870s; however, in 1992, the County determined that the tax exempt status of various institutions in the County should be reexamined. In particular, the County wished to reconsider whether hospitals, nursing homes, and other health care agencies were entitled to exemptions from the real estate tax. As a result, on January 11, 1993, the Hospital received a letter from the County, written by the Director of the County's Office of Tax Assessment, William Collins, notifying the Hospital that its property would be placed on the tax rolls effective for tax year 1993. The letter was accompanied by assessment notices changing the tax status of the Hospital's parcels of land from exempt to taxable.

The Hospital challenged the revocation of its exempt status in an appeal before the County's Board of Assessment Appeals, which, after conducting hearings on the matter during the summer of 1993, affirmed the revocation of the Hospital's tax exempt status on October 28, 1993.

Thereafter, the Hospital appealed the Board's decision to the Common Pleas Court, asserting that it is an institution of purely public charity entitled to an exemption from the real estate tax.

After the parties engaged in discovery, the Hospital filed a "Petition to Remove Property from the Assessment Rolls and to Strike Tax Assessment." The petition asserted that Director William Collins revoked the Hospital's tax exempt status on his own authority, following instructions from a single County Commissioner, Anthony Petrucci, and, therefore, the revocation was invalid. On March 23, 1995, Common Pleas granted the Hospital's petition in part. Common Pleas concluded that Director Collins improperly revoked the Hospital's tax exemption because the members of the Dauphin County Board of Assessment Appeals were not consulted or in any way involved in the termination of the Hospital's tax exempt status. Under Sections 3 and 7 of what is commonly known as the Third Class County Assessment Law (TCCAL),[5] in the view of the Common Pleas Court, only the Board of Assessment Appeals itself is granted the power to eliminate charitable tax exemptions. Common Pleas determined that Mr. Collins did not have the authority to vacate the tax exemption sua sponte, and, in view of the fact that County Commissioners have no authority to grant or revoke tax assessments, Commissioner Petrucci could not delegate such authority to Mr. Collins to revoke the Hospital's exemption. Despite the procedural irregularities of Mr. Collins' revocation, Common Pleas limited the impact of that error to tax year 1993 only (and fiscal year 1993–94 for school taxes), reasoning as follows:

> The [County] maintain[s] that any procedural irregularities that resulted from the January 11 notice, or the conduct of the Director acting sua sponte on the exemption, only affect placing the hospital parcels on the tax rolls for 1993. This Court agrees. The letter of January 11, 1993, when combined with the extensive hearings held before the Board on each of the appeals as well as the ratification and endorsement of the Director's actions by the

Board in denying the appeals ... can be construed as adequate notice to place [the Hospital's] parcels on the 1994 tax rolls. *Harrisburg Hospital v. Board of Assessment Appeals of Dauphin County,* 115 Dauph. 106, 115 (C.P.Pa.1995).

With regard to the merits, Common Pleas rejected the Hospital's claim that it was an institution of purely public charity and held that it was not entitled to a real estate tax exemption applying the test articulated in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*). In *HUP,* the Supreme Court identified the following five factors to be considered when determining whether a particular institution qualifies as a purely public charity:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free of the profit motive.

*Id.* at 22, 487 A.2d at 1317. Although Common Pleas found that the Hospital satisfied the first four prongs of the *HUP* test, it determined that the Hospital does not operate free of a private profit motive. Common Pleas observed that, since the creation of the System in the early 1980s, large amounts of cash and capital have been extracted from the Hospital and used for various profit-making ventures. In the court's view, HMMI and the family medical practices operated by HSS support its finding of a profit motive. The evidence shows that the Hospital subsidizes those business activities, has funded the losses incurred by HMMI and the medical practices, and uses non-competition covenants in physician employment contracts, all of which, the Court concluded, are characteristic of a private profit motive. The Common Pleas Court further determined that the CEO's compensation was excessive and that the bonus plan was designed to

---

**5.** Act of June 26, 1931, P.L. 1379, *as amended,* 72 P.S. §§ 5344, 5348.

improve the "Hospital's bottom line," both suggesting a profit motive. These appeals followed.

### ISSUES PRESENTED

The Hospital contends that the Common Pleas Court erred in holding that it did not operate free of the profit motive and, thus, was not a purely public charity under *HUP*. Further, as to the March 23, 1995 order, the Hospital contends that the Common Pleas Court erred in granting its petition to reinstate its tax exempt status only for the 1993 tax year, because the Hospital's general tax exempt status was never properly revoked under the Assessment Law. With regard to the same order, the County, in its cross appeal, contends that the Common Pleas Court erred in its decision to remove the Hospital's parcels from the assessment rolls even for the one tax year, 1993.

### DISCUSSION

We begin our review by again observing that Article 8, Section 2 of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. Based on that grant of authority, the General Assembly enacted Section 204 of the General County Assessment Law (Law),[6] which confers a tax exemption on property owned by organizations of purely public charity under certain circumstances. It is these two polestars which determine our judicial direction.

■ To receive a charitable tax exemption, the organization must first qualify as an institution of purely public charity, and to do so, the applicant must satisfy *all five* criteria of the *HUP* test. *Associated YM–YWHA of Greater New York/Camp Poyntelle v. County of Wayne*, 149 Pa.Cmwlth. 349, 613 A.2d 125 (1992). An organization does not qualify as a purely public charity merely because it is a nonprofit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth*, 673 A.2d 1021 (Pa. Cmwlth.1996). By satisfying the *HUP* test,

the applicant demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. *City of Washington v. Board of Assessment Appeals of Washington County*, 666 A.2d 352 (Pa.Cmwlth.1995), aff'd, —— Pa. ——, 704 A.2d 120 (1997).

■ However, qualifying as a purely public charity under the *HUP* test does not by itself establish that the applicant is eligible for a charitable tax exemption. *Id.* The organization must likewise satisfy the requirements of Section 204(a) of the General County Assessment Law (Law), 72 P.S. § 5020–204(a), which provides the following standard for tax exempt real property:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

. . . .

(3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity ... founded, endowed, and maintained by public or private charity: **Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and increase of grounds and buildings thereof, and for no other purpose....** (Emphasis added.)

### The Procedural Issue of The March 23, 1995 Order

We consider first the separate issue of the Common Pleas Court's March 23, 1995 order, which reinstated the Hospital's tax exemption for 1993 only.

The challenges of both the Hospital and the County focus on the procedure underlying Mr. Collins' January 11, 1993 letter notifying the Hospital that its tax exemption was revoked. The Hospital asserts that, because neither Mr. Collins nor Commissioner Petrucci had the authority to revoke its charitable exemption in the first instance, any subsequent confirmation of that revocation was invalid and, accordingly, the Board's subsequent decision on October 28, 1993, upholding the revocation was a nullity. Hence, the Hospital's tax exemption must be completely

---

**6.** Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204.

restored. Additionally, the Hospital further argues that even if the Board's subsequent decision ratified Collins' actions, the Board did not provide notice within five days of the revocation of the Hospital's charitable exemption as is required under Sections 7 and 8 of the TCCAL, 72 P.S. §§ 5348–5349.[7] The Board **affirmed** the revocation of the Hospital's exemptions on October 28, 1993, and sent notice to the Hospital of that decision on November 30, 1993. The delay of one month, the Hospital argues, did not satisfy the five-day notice requirement of the TCCAL.

The County, on the other hand, asserts that Director Collins had the authority under the TCCAL to send the January 11th revocation notice because, as Director of the County's office of tax assessment, he was a "subordinate assessor" under the statute. In addition, the County notes that the ultimate decision to place the Hospital's property on the tax rolls was made by the Board on October 28th, and not by Mr. Collins on January 11th.

In regard to the above, the Common Pleas Court found the following relevant facts:

The record is clear that the Board made no decision nor took any vote on the Director's actions in dissolving the [Hospital's] tax exempt status. The January 11, 1993 letter to the [Hospital] purporting to be at the 'direction of the Board of Assessment Appeals' was not supported by any official action. In fact, the minutes of the January 7, 1993 meeting of the Board reveals that the Director only advised the Board that **he had revoked** the tax exempt status of the hospitals. He did not seek their permission to take such a step[,] nor did he request Board approval or ratification of his conduct.

115 Dauph. at 111 (emphasis added).

■ We agree with the Common Pleas Court's conclusion that Director Collins could

not, acting on his own authority, revoke the Hospital's tax exempt status. Only the **Board** is given the authority under the TCCAL to make and supervise assessments; nothing in the statute indicates that such authority is shared with the director of a county's tax assessment office, nor is he a "subordinate assessor." But, even if we agreed that Mr. Collins could be deemed a "subordinate assessor" under the TCCAL, the statute does not give "subordinate assessors" the authority to either exclude property from taxation or nullify an existing exemption.

■ Moreover, we agree with Common Pleas that the impact of Mr. Collins' ultra vires actions in this matter is limited to the tax year 1993 and fiscal year 1993–94. After conducting hearings in this matter, the Board affirmed Mr. Collins' decision on October 28, 1993, and at that time placed the Hospital's properties on the tax rolls.

■ The Hospital argues that it was not mailed notice within five days of the Board's decision as required by Sections 7 and 8 of the TCCAL. But the purpose of the five-day notice is to inform the aggrieved taxpayer who receives a change of assessment of its right "to appeal to the **board** for trial." Here, the Hospital had already appealed the change to the Board and already had a trial. The Board's decision resulted in the ratification of Collins' January 11, 1993 notification of revocation. The TCCAL does not additionally require the Board to mail notice within five days after its decision to inform an aggrieved party of their right to appeal to the Common Pleas Court. Furthermore, Section 11 of the TCCAL, 72 P.S. § 5350b, provides that a defect in the service of notices required by the act is not by itself a

---

7. Section 7 of the TCCAL states that the Board is authorized to make additions and revisions to the assessment roll "at any time in the year, so long as the notice provisions of Section 8 are complied with." 72 P.S. § 5348. Section 8 of the TCCAL provides in relevant part:

(b) The board shall cause to be mailed to each owner of property or person assessed ... the value of whose property or personal assess-

ment has been changed from that finally fixed in the preceding assessment roll ... a notice of such change.... **Such notice shall be mailed within five days from the date the board made such change** or added said property to the roll and shall state that any person aggrieved by any assessment ... may appeal to the board for trial....

72 P.S. § 5349(b) (emphasis added).

ground for setting aside an assessment, but merely grants the aggrieved party in that circumstance the right to a hearing. Hence, the five-day notice provision of the TCCAL, in our view, is inapplicable under the facts in this case.

Accordingly, we hold that the Common Pleas Court correctly reinstated the Hospital's tax exemption for the tax year 1993 and fiscal year 1993–94 and correctly determined that the revocation of the exemption was effective for subsequent years.

### The Substantive Issue: Is Harrisburg Hospital Entitled to a Charitable Exemption?

The Hospital contends that Common Pleas erred in holding that it was not a purely public charity under the *HUP* test and that it did not sustain its burden of proving that the Hospital operated entirely free of a profit motive. And, this one criterion of the HUP test is the only issue which need concern us in the resolution of this appeal.

 In determining whether an institution is free from the profit motive, two primary concerns of this Court are whether it actually made a "profit" and whether excessive salaries and fringe benefits were paid to its corporate officers. *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review, County of Allegheny*, 536 Pa. 478, 640 A.2d 380 (1994). Other factors which might suggest that there is a profit motive include providing services to for-profit businesses, making loans at market interest rates, and owning for-profit subsidiary corporations. *Sacred Heart.* On the other hand, when an organization has a surplus of revenue and reinvests that money into the maintenance and operation of its own facility, that surplus revenue does not constitute private "profit." *West Allegheny Hospital v. Board of Property Assessment, Appeals & Review*, 500 Pa. 236, 455 A.2d 1170 (1982); *Sacred Heart.*

The Hospital argues that Common Pleas erred because the Court was uncomfortable with the Hospital's development of an non-traditional integrated health care delivery system. The Hospital believes that such or-ganizational changes are necessary for it to continue to function as a viable community hospital. Hence, Common Pleas' preoccupation with the Hospital's attempt to function in the modern health care environment, in particular the Hospital's purchase of medical practices, caused the court to erroneously find a profit motive. We disagree. If anything, although the modern health care environment may require the judiciary to broaden its judicial view, the standard of what entitles an entity to a charitable exemption remains constant.

Common Pleas did not conclude that the Hospital had a profit motive merely because it had an unusual or complex organizational structure. Instead, the reasoning of Common Pleas focused on two factors: first, the large amounts of cash and capital diverted from the Hospital to entities that exhibited a profit motive; and second, certain practices of the Hospital itself, specifically, the salary of the CEO and other top management, the bonus system, and the Hospital's non-competition contracts with its managers.

### The Diversion of the Hospital's Funds Into For–Profit and Non-Profit Entities

 The Hospital is the single entity in the System which has the largest positive cash flow and may be viewed as the financial engine of the entire System. The financial report, prepared on behalf of the County by a certified public accountant for use at trial, revealed that the Hospital had earned, from 1991 to 1994, $21,300,000 in net income, and, for the same period, had a positive cash flow from its operating activities totaling $71,200,-000. (Report of Richard Drobnicki at 32–33; Reproduced Record (R.R.) at 786a–787a.) The report concluded that, as a result of its profitable operations and cash flows, the Hospital was able to transfer millions of dollars in contributions and cash to CHSS. (*Id.*) Even the report of the Hospital's own expert, Dr. William O. Cleverly, states that thirty percent of the Hospital's net income for the fiscal years ending in 1992, 1993, and 1994, was transferred to CHSS, which, in turn, transferred that money to its controlled sub-

sidiaries. (Report of Dr. Cleverly at 3–4; R.R. at 438a–39a.)

Common Pleas' findings of fact, which are not challenged by the Hospital as being unsupported by competent evidence, demonstrate that the Hospital's funds have been diverted through CHSS into various for-profit and non-profit ventures. Specifically, Common Pleas found as fact that, from 1990 through 1994, the Hospital made approximately $23,700,000 in capital contributions and cash advances to CHSS, and that the Hospital's excess cash flow is the primary source of funds which CHSS uses to finance subsidiary corporations. (Findings of Fact Nos. 35 and 50; 116 Dauph. at 198, 200.) The ventures financed by CHSS using the Hospital's funds include the for-profit corporation, HMMI, as well as other ventures, in particular the family medical practices, which are overtly non-profit, but determined by Common Pleas to have the attributes of profit-making entities. Because an institution, or business, loses money does not mean, a fortiori, that it does not have a profit motive.

There is a clear financial connection between the Hospital and its for-profit corporate sibling, HMMI. From 1990 through 1993, CHSS invested more than $8,400,000 in HMMI, and, as found by Common Pleas, the primary source of those funds was the excess cash from the Hospital. Moreover, a substantial asset of the Hospital, a $1,700,000 debt HMMI owed to the Hospital, was transferred to CHSS.

In the case of HMMI, the Hospital's funds were clearly used by a for-profit business entity; moreover, certain of the other entities funded by the Hospital through CHSS, although organized as non-profit corporations, were also found by Common Pleas to have a profit motive.

With regard to the family medical practices, which were originally part of HMMI but are now under the control of HSS, HMMI invested approximately $5,400,000 to establish and cover the losses of those practices from 1990 to 1994. HMMI's losses during that period exceeded $3,000,000. Common Pleas found that the money to cover those losses came from CHSS and, ultimately, from the Hospital.[8]

▇ The record more than adequately supports Common Pleas' conclusion that the family practice centers, which are financed by CHSS using the Hospital's funds, are not operated free of the profit motive. The purchased family practices were originally independent for-profit business and, after being brought into the System, were operated by HMMI, the System's for-profit entity. Although they were later transferred to HSS, a non-profit entity, nothing in the record shows that the operations of those practices changed after HSS assumed control. The practices are operated in competition with other for-profit medical practices in the Harrisburg area. *Unionville–Chadds Ford School District v. Chester County Board of Assessment Appeals*, 692 A.2d 1136 (Pa. Cmwlth.1997) (competition between a non-profit institution and others engaged in similar businesses may indicate a proscribed profit motive), *appeal granted*, 549 Pa. 731, 702 A.2d 1063 (1997). Further, nothing in the record indicates that the family medical practices provide any charitable care, or have any charitable purpose or mission at all. Instead, the practices are of considerable economic importance to the Hospital because they ensure a constant flow of patients to the Hospital, and not because they improve the charitable mission of the Hospital. The fact that the family practice centers provide the Hospital with a regular flow of patients, as observed by Common Pleas, explains the Hospital's willingness to cover the regular losses incurred by the practices. A profit-making organization does not become a charitable entity because it no longer makes a profit but operates at a loss.

---

8. In addition to HMMI and the family practice centers, the Hospital's funds, channeled through CHSS, are being used to support the operations of the Harrisfield assisted living facility, which is operated by CHSS using a subsidiary corporation, CEC. This Court has previously determined that Harrisfield is not a purely public charity. *In* re Appeal of Capital Extended Care, 148 Pa. Cmwlth. 128, 609 A.2d 896 (1992). Similarly, CHSS funds Health Reach Home Care, a non-profit corporation, and Capital Psychiatric and Psychological Associates, a mental health practice, formerly a separate corporate entity but now part of HSS.

Furthermore, the Common Pleas Court properly determined that the non-competition clauses in the employment contracts between HSS and the family practice centers constituted additional evidence that the practices have a private profit motive. Perhaps standing alone, the HSS's use of non-competition clauses in its employment contracts would not be sufficient to conclusively rebut the Hospital's claim that it is free of the profit motive; however, combined with all of the other relevant evidence adduced in this case, we believe that non-competition agreements are indicative of a profit motive.

Essentially, the non-competition clauses prevent the family practice physicians from resigning from their employment and establishing competing medical practices. The non-competition clauses in the physicians' employment contracts enhance the profit making potential of the Hospital, because it keeps patients within the System by preventing physicians from leaving their employment and moving patients to new private practices, thereby protecting the System's market share. Although this is a valid business purpose and serves to protect the Hospital's interests, **the polestar of a charitable hospital is providing service to persons in need of medical care, and not protecting its market share.** The non-competition clauses do not enhance the Hospital's ability to provide charity care. Further, Common Pleas wisely observed that the non-competition clauses could have the effect of depriving patients of medical care by doctors precluded from practicing under that term of the contract.

In light of all the above, we conclude that the holding of the Common Pleas Court that the Hospital is not free of the profit motive was correct. When a hospital reinvests its surplus revenue back into the maintenance and operation of its facility, the surplus revenue is not "profit." *West Allegheny Hospital.* However, instead of reinvesting its monies back into its facilities, the Hospital decided to transfer vast amounts of money to various businesses ventures (one

overtly for-profit and others ostensibly non-profit but operated with a profit motive), using CHSS as a conduit for those funds. Those transfers, in our view, constitute clear evidence of a private profit motive on part of the Hospital. *See School District of Erie v. Hamot Medical Center,* 144 Pa. Cmwlth. 668, 602 A.2d 407 (1992) (Hamot Medical Center did not operate free of the profit motive when, among other things, it transferred $25,000,000 over eight years to related corporations, which then invested a substantial portion of that money in for-profit real estate investments); *cf. Sacred Heart* (loaning money to for-profit corporations and ownership of such entities is evidence that the applicant is not free of the profit motive).

### *Executive Salaries, and Bonuses, and Employee Non–Competition Agreements for Top Level Managers*

Although the Common Pleas Court found that the base salaries of Hospital executives were not excessive, the court determined that the CEO's total compensation package was inconsistent with the compensation level of a charitable institution. When salary, bonus, and fringe benefits are combined, the CEO's compensation exceeded $400,000 in 1994.[9] The record also indicates that the CEO additionally receives an automobile and a country club membership. (Report of Drobnicki at 31; R.R. at 785a.) Dr. Cleverly's Report, using a 1994 CEO salary of $291,000, which is significantly smaller than the over $400,000 the CEO actually earned for that year, determined that the Hospital CEO made twenty-percent more than his "peer group," comprised of executives employed by other non-profit entities. The County asserts that Dr. Cleverly's report is meaningless because it is unknown whether any of the institutions comprising the peer group are purely public charities; however, considering that the CEO's actual compensation was approximately twenty-five percent more than the salary used by Dr. Cleverly, the CEO is clearly making substantially more than the salaries of the executives com-

---

**9.** While Common Pleas did not make a precise finding as to the CEO's total compensation, considering the salary, bonus and the extensive and valuable fringe benefits provided by the Hospital, we find that the CEO's salary exceeded $400,000. *See* (Report of Drobnicki at 31; R.R. at 785a.)

prising Dr. Cleverly's peer group, whoever they may be or whatever the status of the institution. Therefore, we agree with Common Pleas that the CEO's salary is excessive and indicative of a profit motive.

With regard to the bonus plan, the Hospital's program gives a limited class of management employees thirty percent bonuses, in the case of the CEO forty percent, for meeting certain business goals and milestones. Until 1994, when charity care was considered as a program goal, the bonuses were exclusively related to financial improvement, such as budget, revenue, and return on investments. The bonus plan's emphasis on the "bottom line" rather than the promotion of charity indicated a profit motive.

▌ A bonus plan is not necessarily contrary to the charitable mission of the Hospital, because the Hospital must attract quality personnel in order to effectively serve the health care needs of its patients. Further, the Hospital's interest in improving its financial performance by itself does not indicate a profit motive; a charity is not required to be insolvent or poorly managed to qualify as a purely public charity. *The Couriers–Susquehanna, Inc. v. County of Dauphin,* 693 A.2d 626 (Pa.Cmwlth.1997) (*Couriers II*). Nevertheless, the purpose of *this* bonus plan was solely to improve the business performance of the Hospital:

*PURPOSE*

The [bonus plan] is designed to reward members of the management team for achieving short-term and longer range financial goals and marketing objectives, quality standards and strategic business objectives.

*OBJECTIVES*

Within the overall purpose the specific objectives of the [bonus plan] are to:

-Attract and retain high caliber managerial talent.

-Reinforce annual and longer term **business objectives.**

-**Provide higher than average compensation opportunities where performance warrants.** (Emphasis added.)

(Management Incentive Compensation Plan (MICP)(1994 version) at 1; R.R. at 666a); (MICP Revised) (1992–94 version) at 1; R.R. at 674a. It is clear from the above that the bonus plan is designed to improve the Hospital's business performance, and not the improvement of the Hospital's ability to render charity care. Moreover, as observed by Common Pleas, even when "budget charity care" was included in the performance goals in 1994, the overall objective of the bonus plan remained the financial bottom line. (MICP at 4; R.R. at 669a.) Under these facts, the bonus plan is indicative of a profit motive.

Finally, Common Pleas also found that the non-competition clauses in the employment contracts between certain top level managers and the Hospital which employees enter into with the Hospital in return for additional consideration, was further evidence of a profit motive. Based on our discussion relative to the non-competition clauses in the physician contracts, we agree that the employee non-competition clauses in this case are evidence of a profit motive.

### CONCLUSION

Because the Hospital is not free of the profit motive, it does not qualify as a purely public charity under *HUP*. Because the Hospital failed the *HUP* test, there is no need to consider the criterion under Section 204 of the Law for a charitable exemption from the real estate tax. Accordingly, the orders of Common Pleas are affirmed.[10]

### ORDER

NOW, January 26, 1998, the orders of the Court of Common Pleas of Dauphin County

---

**10.** Governor Tom Ridge recently signed into law the Institutions of Purely Public Charity Act (Act), Act of November 26, 1997, P.L. ____, No. 55, which has enacted extensive legislative changes under the provisions of Article 8, Section 2(a)(v) of the Constitution, which provides:

 (a) The General Assembly may by law exempt from taxation:

 ....

 (v) Institutions of purely public charity....

 Although Section 16 of the Act provides that its major provisions will take place immediately, they have no effect on the tax years at issue in this case.

in the above-captioned matters are hereby affirmed.